# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 16, 2010

## NOEL MONTEPEQUE, ET AL. v. PATRICIA CLAIRE ADEVAI, EXECUTRIX OF THE ESTATE OF JOSEPH ADEVAI

**Appeal from the Chancery Court for Hamblen County**
**No. 2007-699      Thomas R. Frierson, II, Chancellor**

---

**No. E2009-01871-COA-R3-CV - FILED AUGUST 4, 2010**

---

The parties own adjoining properties with a common party wall. The building belonging to Noel Montepeque and Celia M. Martinez (collectively "Party A") is one story, whereas the building of Joseph Adevai ("Party B")[1] is two stories and overlooks Party A's roof. The party wall contains four windows on the second level of Party B's building. The bottom sills of two of these windows are below the roof line, thus creating open spaces between the party wall and Party A's roof. While Party A was in the process of having a new rubberized roof installed by a contractor, a dispute arose between the parties concerning the manner in which the new roof would be secured to the party wall. Actions allegedly taken by Mr. Adevai to remove the flashing covering the party wall windows eventually resulted in water damage to the existing roof and interior portions of Party A's building. Party A sued Mr. Adevai for compensatory damages and requested that Mr. Adevai be enjoined from committing further damage to the party wall. Mr. Adevai filed a counterclaim, alleging harassment and intimidation by Party A. Following a bench trial, the trial court dismissed the counterclaim and awarded Party A damages for negligence, totaling $28,350.00. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J. and CHARLES D. SUSANO, JR., J., joined.

J. Randall Shelton, Morristown, Tennessee, for the appellant, Patricia Claire Adevai, Executrix of the Estate of Joseph Adevai.

---

[1]Mr. Adevai's wife was not included on the deed. However, as she is the Executrix of the estate, we will include her in "Party B."

C. Dwaine Evans, Morristown, Tennessee, for the appellees, Noel Montepeque and Celia M. Martinez.

**OPINION**

**I.  BACKGROUND**

Party A acquired fee simple title as tenants in common to certain real property located at 1014 South Cumberland Street in Morristown by warranty deed on May 14, 2004.  The original defendant in this case, Mr. Joseph Adevai,[2] obtained fee simple title to the property located next door at 1016 South Cumberland by warranty deed on August 31, 2007.  Party B's property adjoins Party A's property through a party wall, which establishes a common boundary line between the two separate properties.  Whereas Party B's deed contains no reference to the common wall, Party A's deed specifically refers to it:  "THERE IS ALSO CONVEYED to the grantees herein as undivided one half interest in and to the party wall lying between said buildings, as aforesaid, and the grantees, their heirs and assigns, shall have the right to use the entire strength of said party wall for the support of their said building . . . ."

Party A's property is a one-story building, while Party B's adjacent property is two stories in height.  The party wall in question extends beyond the first-story level and overlooks Party A's relatively flat roof.  The exposed portion of the party wall that comprises Party B's second story contains one double-window frame and three single-window openings, which were installed at the time the buildings were originally constructed.  Party A's existing roof consisted of a hot-tar composite, which had been built up with successive layers of tar added over time by previous owners.  The increased height of Party A's roof obscured the bottom windowsill of two of Party B's windows (one double-window set and one single window) in the party wall.  To prevent water from entering the one-story building via a gap between the roof line and those windows, a previous owner had filled the space with a piece of plywood that was covered with tar and sealed against the glass of Party B's windows with caulking material, thus preventing the windows from being opened.  Party A's roof was sealed with flashing that extended from the roof and was attached to the plywood.

Gary Robinson ("Mr. Robinson") is the owner of Robinson Roofing and Construction ("RR & C").  At the time of this litigation, his company had been in existence for over three years, although Mr. Robinson stated that he had been in the roofing and construction business

---

[2] While this action was pending, Mr. Adevai died on December 28, 2008.  Pursuant to Tenn. R. Civ. P. 25, Patricia Claire Adevai, Executrix of the Estate of Joseph Adevai, was substituted as the party Defendant in this action.

for approximately 30 years prior to establishing RR & C. In October 2007, Party A retained RR & C to replace his roof at 1014 South Cumberland Street. They agreed that Mr. Robinson would install a new roof of rubberized material.

According to his testimony at trial, Mr. Robinson soon realized that the recessed windows that were partially below the roof line presented a problem in attaching the rubber roof to the party wall. Mr. Robinson and Mr. Adevai discussed the situation and agreed upon a possible solution. Mr. Robinson related the following on direct examination:

Q      Now did you happen to have a conversation with Mr. Adevai concerning the matter to connect that roof to that wall?

A      Yes I did.

Q      And did you and he actually come up with some solution, some agreement for a way to do that?

A      Yes we did.

Q      Tell us what you and he agreed upon[.]

A      I was going to fill in the bottom portion of that window with a small wall and then run my flashing from [Party A's] roof up under that wall and then Mr. Adevai would set his windows on top of that, his new windows.

* * *

Q      There's actually, of the windows, of the four windows in that [party] wall only two of them are below the roof line; is that correct?

A      Yes.

Q      And just to make sure I understand, you and Mr. Adevai agreed that you would block in the bottom part of the windows?

A      Yes.

Q      Well first of all you'd have to remove these windows?

-3-

A      Right.

Q      Correct?

A      Right.

Q      And then you would block in the bottom part of the windows?

A      Right.

Q      And then put new windows in the upper part?

A      Right.

Q      And if you had done that the roof would have attached to those new block[s], is that correct?

A      Yeah.  The new wall . . . .

Q      And would not have touched the windows?

A      The new wall that I built, yes.

Q      Okay.  Was that ever done?

A      No we never did do it.

Q      Did you find out at some point that Mr. Adevai changed his mind about allowing you all to do that?

A      Yes.

In a discovery deposition prior to his death, Mr. Adevai discussed the arrangement with the roofer:

A      The roofer came to me and was talking about the windows and the roof.

Q      Well, tell me exactly what he said[.]

A   He said that . . . he had a problem there on what to do by the windows, because there was a space there and he didn't know what to do, really. So, I said, "Well, I don't know what you're going to do." I said, "What I'm going to do, I have three old antique windows and I'm going to replace them with brand new vinyl windows." . . . Then later, I guess he went to talk to [Mr. Montepeque] and he came back with an idea. I said, "Well, what's your idea? . . . He suggested that I come up like this with a sill to higher than [Party A's] roof and I said, "Oh, well, show me what you mean." So, he said he will build up just a little higher . . . . There would be a sill, you know, this windowsill, and his roof will be here and then he could butt it up against this here part and it will block the water from coming down to [Party A's] building . . . .

* * *

Q   Okay, so the sill would be built approximately 10 inches above the bottom of the window, is that correct?

A   Right.

* * *

A   . . . So, I said to him, "Well," I said, "what we'll have to do is I have to put new windows in" and I said, "I was going to put new windows in anyway," but now I have a problem, if I'm going to put new windows in, . . . I have to go up and break out the wall now, because you have to have a fire escape for the tenants.[3] So, if I go up this high, now I have to eliminate this here, say about 10 inches. I would have to start here and go up and then over like this . . . . I said, "But the windows are going to cost me about $107.00 apiece, because I've bought windows before." I said, "That comes to $321.00." I said, "If he pays half, then I'll do it." So he said, "All right, well, I'll go down and talk to him."

* * *

---

[3]As the second floor of Party B's building had apparently been used for storage by previous owners, no prior dispute had arisen regarding the fact that certain windows could not be opened because of Party A's roof. Mr. Adevai was remodeling the second floor for future use as rental apartments. Accordingly, he desired that all the windows be usable.

A      The plaintiff comes on the roof . . . . I explained to him . . . what I had to do. I said, "I have to make the hole bigger, which labor I will provide. It will be free, you know. I'll take that expense." I said, "But the windows are going to cost me around $300.00 or so, coming up with tax." I said, "If you'll pay half." Well, he looked at me and he said, "No." He said, "That's your problem. That's your problem. I'm not going to do that." I said, "Well, okay then he's not going to build a sill. I'm not going to spend the extra money if you won't even . . . it's your roof. It's not my problem, so why should I replace it? Why should I go to the expense if you won't even give me half?" So, that was it. I told the roofer, "You don't touch my windows."

Mr. Montepeque claims he was unaware of the agreement between Mr. Robinson and Mr. Adevai prior to the encounter. He described the confrontation with Mr. Adevai as follows:

Q      I take it you and Mr. Adevai are together and he is telling you that he is willing to raise the window to a new height, build a new window seal such that the window seal would be higher than your roof line?

A      Yes sir.

* * *

Q      . . . And it's at this point that he says he's willing to do this if you'll pay for one half?

A      For fifty percent.

* * *

Q      And you wanted to know what the total amount would be . . .

A      Yes sir.

Q      . . . before you would commit to one half?

A      Absolutely.

Q      And you're saying he would not give you any amount?

A      No sir.

Q      Is that correct?

A      Yes sir.

On direct examination, Mr. Montepeque testified that he responded to Mr. Adevai's request by asking, "Fifty percent of what?" He contends that Mr. Adevai did not explain "his repairs" or provide a total dollar amount. According to Mr. Montepeque, Mr. Adevai went "ballistic," became "upset" and started "yelling"; he instructed Mr. Montepeque to not "touch my windows." Mr. Montepeque claimed that he never told Mr. Adevai that he would not pay one half of the cost to move the windows up the wall. He asserted that he "would have been gladly honored to pay that cost."

Mr. Robinson's testimony on cross-examination reveals some contradiction of Mr. Montepeque's assertion that he was not aware of the arrangement made between the roofing contractor and Mr. Adevai:

Q      Now wait a minute Mr. Robinson, at this point when you and Mr. Adevai are working it out Mr. Montepeque didn't even know about it. He didn't know what you and Mr. Adevai were working out[.]

A      Yes he did. Yes I believe we talked about it.

Q      Now Mr. Robinson, Mr. Montepeque testified under oath in his deposition that he wasn't aware of what you and Mr. Adevai worked out?

A      I had explained to him what we were going to do to repair this, yes.

Q      Okay. Now and what report did you bring back to Mr. Adevai about Mr. Montepeque's position in regard to relocating that window, raising it higher so it wouldn't interfere with the roof line?

A      [Mr. Montepeque] believed that if I thought that was the best thing for

his roof that's what we would do.

Q    Well did Mr. Montepeque tell you that he was not going to pay a hundred and fifty dollars that that was Mr. Adevai's problem?

A    That was between them.

* * *

Q    Did he tell that to you?

A    Umm . . . (witness paused) . . . he may have. I don't know.

At the time the dispute between the parties arose, the roofer had completed most of the work on Party A's roof with the exception of the area around the windows. During the re-roofing process, he had removed the tar-covered piece of plywood which had been used previously to prevent water leakage into the one-story building. Mr. Robinson related:

Q    . . . [W]as there anyway that you could just stop where you were at that point and [Party A's] building would be sealed and protected from water?

A    No, no.

Q    Is there in fact an opening there at the windows that water can go down into [Party A's] building if that's not sealed at that point?

A    Yes if it's not sealed then yes, water will go in.

Q    And did you have to do something at that point to seal that area to keep [water] out of [Party A's] property?

A    Yeah, I let [Party A] know that we needed to do something.

To complete the roofing job and in an attempt to prevent water leakage at the location of the windows, Mr. Robinson, at Party A's direction, ran the rubberized material from Party A's roof and up the party wall, thereby covering Party B's windows. According to Mr. Robinson, this action was intended only as a "temporary fix" until the dispute between Party A and

Party B could be resolved. Mr. Robinson testified that in lieu of the original agreement with Mr. Adevai to relocate the windows, he was not aware of any other alternative strategy to seal Party A's roof other than covering the windows. However, he admitted during cross-examination that an alternative approach would have been to strip away the multiple layers of hot tar and to install the rubberized roof on the original roof, thereby completely avoiding the necessity of having to deal with the party wall windows.

Prior to Mr. Robinson's "temporary fix,"Mr. Adevai had warned Party A, through the roofing contractor, that he would "tear off" or "cut off" any rubber roofing material that covered the windows in the party wall. According to Mr. Robinson, he instructed Mr. Adevai that removing the rubber covering would cause water to go into Party A's building:

Q      . . . [D]id Mr. Adevai make a statement as far as what he was going to do . . . ?

A      He had told me before that if I covered them he was going to tear it off.

\* \* \*

Q      Did you ever tell him that if he did that that would cause water damage?

A      Yes I did.

Q      You told Mr. Adevai that?

A      Yes.

Q      That that would cause water to go into [Party A's] building?

A      Yes.

Mr. Montepeque testified that by the following day after the installation, Mr. Adevai had cut away the rubberized material covering the windows. On October 18, 2007, Party A filed a complaint with the Morristown Police Department against Mr. Adevai, accusing him of damaging the recently replaced roof.

In the meantime, Party A took no remedial measures to cover the openings beneath the windows. Mr. Montepeque testified as follows on cross-examination:

Q      Did it look to you like that there was an opening that rain could get through?

A      Absolutely. Rain would have got in there all the time. If it rained, yes.

* * *

Q      So you knew at that point that there was a potential for rain to come through that window?

A      Yes, yes.

Q      And here it is June 25, 2009 and you haven't taken any remedial action?

A      Remember the gentleman instructed me to not touch his wall cause everything I would do he will remove it. He will cut it off.

Q      Mr. Montepeque you heard your own roofer testify there was a piece of plywood there that evidently worked for many, many years to prevent any rain from coming in but you didn't take any remedial action to even replace the piece of plywood?

A      After I saw the gentleman as violent as he did and cutting, not only from the inside of his building but escaping on top of my roof to cut off the rest of it do you think I'm going to . . . be trying to confront this gentleman by doing any other remedies to my roof.

Predictably, Party A sustained significant water damage to the roof and to certain interior portions of the property. Mr. Robinson testified as follows:

Q      Mr. Robinson you testified that before you did this new roof you had seen a couple of water spots inside the building, right?

A      He had had some leaks in the past, yes sir.

Q      The condition of the ceiling inside the building today is it about the same or is it substantially worse than it was . . .

A      It's substantially worse.

-10-

Mr. Robinson estimated the minimum cost to repair the interior damage to be $8,750 and $19,600 to repair damage to the existing roof. Mr. Montepeque testified that while there was evidence of past leaks in his building, no water had leaked into the building while he owned it. To rebut Mr. Robinson's testimony that "[Mr. Montepeque] called me. He had some leaks in the building, yes" and "That's why he had called me, he had leaks when it rained," Mr. Montepeque suggested that Mr. Robinson was recalling work done on another one of his buildings.

On December 4, 2007, Party A filed this lawsuit, alleging that Mr. Adevai had removed sections of Party A's newly installed rubber roof which was attached to the party wall. Additionally, Party A averred that as a result of Party B's actions, rainwater had entered Party A's building and caused substantial damage to the existing roof and interior portions of the property. Party A further asserted that Mr. Adevai trespassed on Party A's property and drilled holes in the party wall and the part of Party A's roof that attaches to the party wall. In addition to requesting compensatory damages, Party A asked the trial court to enjoin Party B from committing further damage to the party wall and to declare the relative rights of the parties with respect to the use and maintenance of the party wall. In an answer and counterclaim, Party B sought compensatory damages against Party A for (1) removal of certain terra cotta tiles from Party B's roof and (2) harassment and intimidation.

This action was heard on June 25, 2009. As set forth in its memorandum opinion, the trial court concluded that while Party B had a "prescriptive easement" with respect to the second-floor windows in the party wall, Party A "maintained a prescriptive right to attach flashing to the party wall for purposes of preventing water from entering their building" and that "neither party could take actions which would materially increase the burden upon the servient estate." The trial court found, *inter alia*, that Mr. Adevai's negligence in removing the rubberized coverings from the party wall windows and leaving exposed the openings below the windows directly resulted in water damage to Party A's property, and as such, Party A was entitled to recover $28,350.00 in compensatory damages. The trial court further ordered that the cost of repairing or replacing the windows in the party wall would be the responsibility of Party B and that Party B will be "permitted reasonable access to the party wall and the windows located therein by crossing the roof of [Party A's] building . . . ." Additionally, the trial court concluded that Party B had "failed to carry the burden of proof in establishing entitlement to recover compensatory damages" with regard to the counterclaim, dismissing it in its entirety. Finally, the trial court declared that both parties will be equally responsible for maintaining the party wall.

This timely appeal ensued.

## II. ISSUES

Party B presents five issues for review which are restated as follows:

Whether the trial court erred:

A)  in refusing to admit into evidence the regulations of the Tennessee Department of Health;

B)  in holding that Party A had proven the elements of a trespass claim;

C)  in failing to recognize Party B's entitlement to abate a private nuisance;

D)  in completely excusing Party A's fault; and

E)  in determining the amount of damages.

## III. STANDARD OF REVIEW

Because the case was tried without a jury, the standard of review is *de novo* upon the record with a presumption of correctness as to the findings of fact of the trial court. *See* Tenn. R. App. R. 13(d); *Boarman v. Jaynes*, 109 S.W.3d 286, 289-90 (Tenn. 2003). This court imputes no presumption of correctness on the trial court's conclusions of law. *Rutherford County v. Wilson*, 121 S.W.3d 591, 595 (Tenn. 2003); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).

## IV. ANALYSIS

### A.

Party B's first assertion of error is that the trial court erred in refusing to admit into evidence the rules and regulations promulgated by the Tennessee Department of Health, Bureau of Health Services Administration (the "Rules").

Party B had attached copies of certain rules promulgated by the Tennessee Department

of Health and the Tennessee Department of Commerce and Insurance to his answer and counterclaim, filed on December 31, 2007. Party B specifically referred to these state administrative regulations in his counterclaim as follows:

> [Party A's] new roof extends above the three window sills obstructing and interrupting access, a violation of *Rules of Tennessee Department of Health*, *Bureau of Health Services Administration*, *Division of General Environment[al] Health*, *Chapter 1200-1-2*, *Rental Premises Unfit for Habitation and Rules of Tennessee Department of Commerce and Insurance*, *Division of Fire Prevention*, *Chapter 0780-2-2*, *Codes and Standards* . . . .

The Rules establish basic habitability standards for rental premises, including "minimum standards for light and ventilation" ("[v]entilation shall be provided by openable doors and at least one (1) openable window …") and safety standards ("[e]very dwelling unit shall have at least one outside window or other opening which can be readily opened from the inside without the use of tools … to provide a safe emergency escape or rescue"). Party B intended the second-floor party wall windows to be part of rental apartments that would be leased by Party B after refurbishment. As stated in Party B's brief, the purpose of attaching the Rules to the counterclaim was to inform Party A that Party B's windows in the party wall had to be in compliance with state-mandated habitation standards for light and ventilation as well as escape and rescue. Thus, Party B was attempting to prove that Party A's decision to have the roofing contractor cover those windows with roofing material rendered Party B's rental property in noncompliance with state regulations.

At trial, counsel for Party B requested that the court admit the exhibited Rules into evidence. Counsel for Party A promptly objected to the admission of the Rules into evidence, asserting that no foundation had been laid to show that the Rules applied to the situation or that the Rules were current. After taking the matter under advisement, the trial court later denied Party B's request, ultimately concluding in its memorandum opinion that

> attaching a copy of certain Rules of the Tennessee Department of Health … to the counter[claim] and requesting at the time of trial that the Court take judicial notice of the applicability of the rules does not constitute reasonable notice to the adverse party that a request has been made that the Court take judicial notice thereof.

Trial courts have a wide degree of latitude in deciding whether to admit or exclude evidence. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). As a result, we

-13-

review issues regarding admission of evidence under an abuse of discretion standard. *Id.* In *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001), the Tennessee Supreme Court noted as follows as to the abuse of discretion standard:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge*, 42 S.W.3d at 85 (citations omitted).

In *Latiff v. Dobbs*, No. E2006-02395-COA-R3-CV, 2008 WL 238444 (Tenn. Ct. App. E.S., Jan. 29, 2008), this court noted as follows:

> Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

*Latiff*, 2008 WL 238444, at \*6.

Tenn. R. Evid. 202 governs judicial notice. Tenn. R. Evid. 202(a) mandates that courts take judicial notice of state statutes. "[C]ourts *may take* judicial notice of the rules and regulations of state administrative agencies which have been promulgated by authority of law, have statewide application and are easily ascertainable." *Acuff v. Comm'r of Tenn. Dept. of Labor*, 554 S.W.2d 627, 631 (Tenn. 1977) (emphasis added). However, the courts are not mandated to take judicial notice of a state agency's regulations, rules, or policy decisions. See *State v. Jackson*, No. E2004-01755-CCA-R3-CD, 2005 WL 2604054, at \*6 (Tenn. Crim. App., Oct. 14, 2005); *State v. McClure*, 74 S.W.3d 362, 371 (Tenn. Crim. App. 2001) (citing *State v. Womack*, No. W1999-01257-CCA-R3-CD, 1999 WL 1097971, at \*6 (Tenn. Crim. App. Nov. 29, 1999)). With respect to optional judicial notice of state rules and regulations, Tenn. R. Evid. 202(b) provides as follows:

Upon reasonable notice to adverse parties, a party may request that the court take, and the court may take, judicial notice of (1) all other duly adopted federal and state rules of court, (2) all duly published regulations of federal and state agencies and proclamations of the Tennessee Wildlife Resources Agency, (3) all duly enacted ordinances of municipalities or other governmental subdivisions, (4) any matter of law which would fall within the scope of this subsection or subsection (a) of this rule but for the fact that it has been replaced, superseded, or otherwise rendered no longer in force, and (5) treaties, conventions, the laws of foreign countries, international law, and maritime law.

Tenn. R. Evid. 202(b).

Two criteria must be met prior to a court taking judicial notice of a regulation or rule published by a federal or state agency: *First*, "a party must request that the court take such judicial notice," and *second*, "[a party] must give reasonable notice to the adverse party." Tenn. R. Evid. 202(b); *State v. McClure*, 74 S.W.3d 362, 367 (Tenn. Crim. App. 2001). As noted in the trial court's memorandum opinion, however, Tenn. R. Evid. 202 does not specify what constitutes "reasonable notice," and therefore, it is left to the sound discretion of the trial judge to ascertain whether the reasonable notice criterion has been satisfied under the particular circumstances of the case.

Party B argues in her brief that because the exhibited Rules constituted part of Party B's responsive pleading under Tenn. R. Civ. P. 10.03, the eighteen months between service and the trial proceedings provided timely notice to Party A that Party B intended to use the regulations as potential evidence. At trial, counsel for Party A contended that they were not aware until the morning of the trial that Party B's counsel intended to file the Rules as exhibits of substantive evidence.

"Merely attaching a document to a pleading does not place that document in evidence." *Pinney v. Tarpley*, 686 S.W.2d 574, 579 (Tenn. Ct. App. 1984). Even if the trial court had taken judicial notice of the Rules, it was not required to admit them into evidence. *State v. Zelek, II*, No. M2007-01776-CCA-R3-CD, 2009 WL 890904, at *7 (Tenn. Crim. App. Apr. 3, 2009). Because the Rules did not come into play in the trial court's negligence analysis, the content of the Rules lacked relevance to the issue before the court. Accordingly, we find no error.

**B.**

-15-

The second issue raised by Party B is that the trial court erred in "holding" that Party A had proven the elements of a trespass claim. As inferred from the trial court's memorandum opinion, Party A's recovery for damages was not based on the tort of trespass. The Tennessee Supreme Court has stated, "[i]f two adjoining owners build a wall partly on each lot, and by agreement or by continuous use for 20 years treat it as a party wall, each has an easement of support for his half." *Carroll Blake Constr. Co. v. Boyle*, 203 S.W. 945, 946 (Tenn. 1918) (quoting *Sanders v. Martin*, 1879 WL 3712, at *1 (Tenn. Apr. 1879)). Relying on early Tennessee case law, the trial court in the instant case concluded that the "evidence preponderates in favor of a determination that although a party wall exists between the real property of [Party A] and [Party B], as the windows in the wall have existed for a period exceeding twenty years, [Party B] maintains a prescriptive easement for the continuation of windows in the wall." Similarly, the trial court determined that Party A concomitantly "maintained a prescriptive right to attach flashing to the party wall for purposes of preventing water from entering their building." The relative rights of each party with respect to a party wall are governed by this underlying principle as noted in the trial court's memorandum opinion:

> The owner of a servient tenement must refrain from doing any act which would interfere with the proper right to use and enjoy the easement vested in the owner of the dominant tenement. On the other hand, the principle that the owner of the easement *cannot materially increase the burden of the servient estate or impose thereon a new and additional burden* underlies the use of all easements.

25 Am. Jur. 2d *Easements and Licenses* § 71 (emphasis added). *See also Adams v. Winnett*, 156 S.W.2d 353, 357 (Tenn. Ct. App. 1941).

As explained in its memorandum opinion, the trial court ordered Party A to recover compensatory damages based on what the court found was Party B's "negligence" in cutting away the rubberized covering over the party-wall windows, thereby exposing open spaces beneath the windows along the party wall. The trial court found that Party B's negligence proximately caused the injury to Party A's real property. Furthermore, the evidence in the record indicated that Party B committed this act with the knowledge that removal of the rubberized flashing from the windows would cause water to enter Party A's building. Party B's liability for property damage was found to be predicated on grounds of negligence, not trespass. Therefore, we overrule Party B's second assignment of error as lacking relevance.

**C.**

In the third issue on appeal, Party B contends that the trial court erred in failing to recognize that Party B was entitled to abate a private nuisance created by Party A's actions in completely obscuring the windows with the roofing material. However, Party B never raised an argument in the counterclaim that Party A had created a nuisance with respect to the windows. Instead, Party B's request for damages was predicated on a theory of "intimidation and harassment" resulting from Party A's filing of a criminal complaint against Mr. Adevai for vandalism and not on any clearly specified actionable tort such as nuisance. Because private nuisance was never at issue in this litigation, this court declines to address this issue at this juncture.

## D.

Party B's fourth assignment of error to the trial court concerns the attribution of no fault to Party A.

In *Manis v. Gibson*, No. E2005-0007-COA-R3-CV, 2006 WL 521466 (Tenn. Ct. App. E.S., Mar. 3, 2006), this court observed as follows regarding the term "comparative fault":

> The phrase "comparative fault" has two meanings, both of which are distinct from "comparative negligence." "Comparative fault" in its general sense means those principles governing the analysis of liability in tort actions. *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 425 n. 7 (Tenn. 1996). These are the governing principles adopted by the Tennessee Supreme Court in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). The Supreme Court's stated goal in adopting these principles was to "more closely link[ ] liability and fault." *Id.* at 58. Therefore, comparative fault in its general sense denotes a system "wherein a particular defendant is liable only for "the percentage of a plaintiff's damages that are caused by that defendant's fault." *Volz v. Ledes*, 895 S.W.2d 677, 680 (Tenn. 1995).
>
> This system has two main components. The first component is a process in which the defendant's liability for the plaintiff's damages is reduced "in proportion to the percentage of negligence attributed to the plaintiff." *Owens*, 915 S.W.2d at 425 n. 7. This component is called "comparative negligence." *Id.* The second component is a subsequent process in which fault is allocated among co-defendants and liability for the plaintiff's damages is apportioned in proportion to the allocation of fault. *Id.* This component is "comparative fault" in its second and more specific sense. *See id.* "The rationale behind this distinction is that negligence is generally the only theory by which the

plaintiff's damages can be reduced; whereas, the defendants' liability may be based on theories of liability other than negligence." *Id.*

2006 WL 521466, at n. 1.

In this matter, the trial court found as follows:

> The evidence supports a determination that Mr. Adevai's actions in (1) removing the rubberized material from the windows placed there for temporary protection and (2) leaving exposed the openings below three windows resulted in significant water damage to Plaintiffs' new roof and interior areas of their building. Because of this negligence, Plaintiffs are entitled to recover compensatory damages.

We find that the evidence of record does not preponderate against the trial court's findings that Party B was negligent and 100% at fault. No evidence of negligence attributable to Party A was presented by Party B.

According to the doctrine of damage mitigation, "an injured party has a duty to exercise reasonable care and due diligence to avoid loss or minimize damages after suffering injury." *Edwards v. Carlock Nissan of Jackson, LLC*, No. W2006-01316-COA-R3-CV, 2007 WL 1048952, at *7 (Tenn. Ct. App. W.S., Apr. 9, 2007); *see also Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 234 (Tenn. Ct. App. 1976); *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.,* 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971); *Gilson v. Gillia,* 321 S.W.2d 855, 865 (Tenn. Ct. App. 1958). As a general rule, "one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover." *Cook & Nichols*, 480 S.W.2d at 545. A critical factor in judging the fulfillment of a party's duty to mitigate is whether the method employed to avoid consequential damages was reasonable under the circumstances. *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963). However, an injured party is excused from a duty to mitigate damages where such a duty would be "unduly burdensome or impossible." *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983); *Haynes*, 546 S.W.2d at 234.

After the disagreement between the parties erupted and Mr. Adevai cut away the rubberized flashing from the party wall windows, Mr. Montepeque testified that he took no remedial measures to protect his property or at least to minimize the potential damage from

rainfall. He testified his lack of action was because of Mr. Adevai's belligerent attitude and his demand to "not . . . touch his windows."

In reviewing testimony by witnesses at trial, the responsibility for assessing the "weight, faith, and credit" to be ascribed to the testimony of witnesses lies in the first instance with the trial court because of its first-hand position in observing the demeanor of witnesses. *McCaleb v. Saturn Corp.,* 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker,* 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). As a result, this court will assign great deference to the trial court's findings based on witness credibility. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court found as follows: "Fearful to engage further confrontation, Plaintiffs took no further action with regard to making additional repairs to include covering the openings beneath the windows." In view of the trial court's acceptance of Mr. Montepeque's testimony, we feel compelled to find the trial court did not err in excusing Party A from mitigating their damages.

## E.

Party B's fifth and final challenge on appeal concerns the trial court's determination of damages. The trial court awarded $28,350 in compensatory damages to Party A. In arriving at that award of damages, the court had before it only repair estimates provided by Mr. Robinson, the roofing contractor. This judicial determination of damages equalled the total amount of two separate repair estimates: $8,750 to repair Party A's interior water damage and $19,600 to fix the existing roof. Party B argues that the amount awarded did not represent "the reasonable cost of restoring the property to its former condition," *Fuller v. Orkin Exterminating Co*., 545 S.W.2d 103, 108 (Tenn. Ct. App. 1975), but permitted Party A to increase the value of the building beyond what it was prior to the structural harm.

In Tennessee, the measure of damages for injury to real property is well-established: "Our appellate courts have uniformly held that the measure of damage for injury to real estate is the difference between the *reasonable market value* of the premises immediately prior to and immediately after injury . . . ." *Id.* (emphasis added); *see also Williams v. Southern Ry. Co*., 306 S.W.2d 98, 101 (Tenn. Ct. App. 1965). In figuring this difference in value, the trier of fact can take into account the reasonable cost associated with "restoring the property to its former condition allowing for depreciation." *McKinnon v. Michaud*, 260 S.W.2d 721, 727 (Tenn. Ct. App. 1953).

Party B further asserts that the testimony of expert witnesses – even testimony left uncontradicted by the opposing party – cannot be considered conclusive by the trial court but is merely advisory. *Burden v. Burden*, 250 S.W.3d 899, 915 (Tenn. Ct. App. 2007) (citing

*Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001)). Party B also argues that the trial court improperly regarded Mr. Robinson as an "expert" witness, even though no judicial determination of his qualifications was made under Tenn. R. Evid. 702, which governs the admissibility of expert testimony.

As a general rule, opinion testimony by lay witnesses is inadmissible. Pursuant to Tenn. R. Evid. 701(b), however, a witness may testify about the value of his services. The testimony offered by Mr. Robinson concerned the cost or value of his services as a roofing contractor and was based on his inspection of the property and preparation of an estimate for the repair. Pursuant to Tenn. R. Evid. 701(b), we find his testimony was admissible and the trial court did not err in allowing the evidence.

Party B offered no opposing expert testimony or report as a rebuttal of Mr. Robinson's testimony, nor did Party B offer a professional real estate appraiser to testify as to the value of Party A's building before and after the water damage. In its memorandum opinion, the trial court noted as justification for its determination of the proper measure of damages that, "[n]o countervailing expert testimony was presented by the Defendant." Therefore, we agree with the trial court that Mr. Robinson's undisputed testimony represents a valid evidentiary basis for the determination of compensatory damages.

## V. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Patricia Claire Adevai, Executrix of the Estate of Joseph Adevai. This case is remanded to the trial court, pursuant to applicable law, for enforcement of that court's judgment and the collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE

-20-